ALEX GROSSMANN & CO., INC., Respondent, v. MERCHANTS REFRIG-
ERATING COMPANY, Appellant.

INDUSTRIAL COLD STORAGE AND WAREHOUSE COMPANY, Appellant,
v. ALEX GROSSMANN & CO., INC., Respondent, Impleaded with
DROSTE-SNYDER PRODUCE CORPORATION, Defendant.

First Department, June 24, 1938.

*William M. Kilcullen* of counsel [*Daniel E. Hanlon,* attorney],
for the appellant Merchants Refrigerating Company.

*Melber Chambers* of counsel [*Edward H. Spencer* with him on the brief; *Sage, Gray, Todd & Sims,* attorneys], for the appellant Industrial Cold Storage and Warehouse Company.

*Walter C. Lundgren* of counsel [*William Piel, Jr., William Leo Mulry* and *Frank J. Berberich* with him on the brief; *Sullivan & Cromwell,* attorneys], for the respondent.

Cohn, J.   As to the transactions set forth in the first and second causes of action of the complaint, appellant Merchants Refrigerating Company (hereinafter referred to as " Merchants ") was protected in its dealings with Eldredge, then the vice-president and general manager of respondent Alex Grossmann & Co., Inc. (hereinafter referred to as " Grossmann ") in New York, by reason of his apparent and implied authority. (*Wen Kroy R. Co.* v. *Public National Bank & T. Co.,* 260 N. Y. 84, 91; *Angerosa* v. *White Company,* 248 App. Div. 425, 427; affd., 275 N. Y. 524; 3 Thompson on Corporations [3d ed.], § 1800.)   The transactions involved here were respectively consummated on December 30, 1932, and December 31, 1932.   Up to that time, in the light of the facts then known to Merchants, there was an insufficient basis for a finding that Merchants knew or should have known that Eldredge was acting without authority.   Upon these two causes of action the judgment should have been directed in favor of Merchants.

As to the third, fourth and fifth causes of action, the trial court correctly found that Grossmann was entitled to recover because it was established that Merchants had converted Grossmann's merchandise.

The third cause of action is based upon the alleged conversion of 1,195 cases of eggs delivered to Merchants by Eldredge on January 12, 1933, and the fourth cause of action is predicated upon the conversion of 1,180 cases of eggs delivered by him to Merchants on January 13, 1933.   This merchandise of Grossmann's was sent by Eldredge to Merchants in order to raise moneys to supply Droste-Snyder Produce Corporation (hereinafter referred to as " Droste-Snyder ") with funds which were to be used to pay for carload lots of eggs bought in a joint venture upon which Eldredge had embarked purportedly on behalf of Grossmann with Droste-Snyder.   In each of these two instances, eggs belonging to Grossmann were delivered as collateral for loans made in the name of Grossmann and evidenced by collateral promissory notes which were executed by Eldredge under the name of Grossmann.   The proceeds of the loans on each of these two shipments were paid by check of Merchants direct to Droste-Snyder.   This was all done pursuant to directions from Eldredge.   In the January twelfth

transaction the loan obtained was in the sum of $7,170, and in the January thirteenth transaction it amounted to $7,080. The evidence is clear that Eldredge had no express or actual authority to conduct these two transactions on behalf of Grossmann. Grossmann was a wholly owned subsidiary of National Dairy Products Corporation. Eldredge's express instructions were not to borrow, and he was wholly without authority to execute a promissory note on behalf of Grossmann. In conducting these two transactions Eldredge had no entry made in the books of Grossmann showing that loans had been obtained from Merchants or that promissory notes had been given or that merchandise had been pledged, or that the proceeds of the loans had been delivered to Droste-Snyder. Eldredge concealed these facts from his employer because he knew he was acting without authority.

It is equally clear that Eldredge had no apparent authority to borrow money upon collateral notes of his principal executed solely by himself. Checks which were received by Merchants from Grossmann during the year 1932 and up to the time the last transaction involved had been consummated bore two signatures, that of Eldredge and of another employee, whereas the two collateral promissory notes delivered by Eldredge to Merchants were in each instance signed by him alone. Though we assume that Eldredge had not resigned as vice-president and director of Grossmann until after January 23, 1933, and that Merchants still believed he was acting as an officer of the corporation throughout, there was still absent proof that Eldredge was acting under apparent authority. An officer of a corporation has no actual or apparent authority by virtue of his office alone to issue negotiable paper in the name of the corporation. (*Jacobus* v. *Jamestown Mantel Co.*, 211 N. Y. 154, 161; *Emmet* v. *Northern Bank of New York*, 173 App. Div. 840; affd., 221 N. Y. 506; 3 Thompson on Corporations [3d ed.], §§ 1679, 1681.) Mr. Harry Lewis, secretary and treasurer of Merchants, who authorized the loans which formed the basis of the third and fourth causes of action, concededly knew that Grossmann was a subsidiary of National Dairy Products Corporation, and that though his concern had done business with many other subsidiaries of that company, he never heard of any loan made to any of them except the loans made at the request of Eldredge. Moreover, instructions by Eldredge that the proceeds of the loans on the collateral notes of January 12 and January 13, 1933, bearing only Eldredge's signature, be paid direct to Droste-Snyder were most unusual and obviously called for inquiry on the part of Merchants as to the authority of Eldredge to issue such directions or to pledge the property of his principal for such a purpose. Significantly enough,

too, the treasurer of Droste-Snyder, Arthur H. Lewis, and the secretary and treasurer of Merchants, Harry Lewis, were brothers who were frequently in touch with each other. Furthermore, Merchants knew that Droste-Snyder had a very small capital and had only been formed in October, 1932, and that its predecessor had had considerable financial difficulty and was practically defunct. In view of all these facts Merchants must have known that Grossmann, a subsidiary of the strong and well-known company, National Dairy Products Corporation, would not make repeated loans of this size and character and in this manner and that it would not sanction the issuance of promissory notes signed only by the general manager of a subsidiary with directions that the proceeds of these loans be paid direct to another company of doubtful financial standing. In these circumstances Merchants was clearly chargeable with knowledge that Eldredge was exceeding his authority and that he was wrongfully disposing of the property of his corporation. Merchants knew or should have known that it was wrongfully receiving Grossmann's merchandise. It was clearly liable in conversion to Grossmann for these transactions.

As to the prior occasion when a loan was made at the instance of Eldredge, namely, in July, 1932, no inquiry had then been made by Merchants as to Eldredge's authority to borrow money on a promissory note in the name of Grossmann. It is important to note that the books of Grossmann did not show that a loan had then been obtained or that a note had then been given.

The claim that Grossmann had sanctioned the joint venture previously conducted by Eldredge with Droste-Snyder in November, 1932, covering the purchase of twenty-five cars of storage eggs, is without basis. No entries appeared on the books of Grossmann showing that there was such a joint venture and the check for half the profits, amounting to $947.47, was not recorded on the books of Grossmann until December thirty-first, when it was entered to "Cost of Produce." The books of Grossmann thus entirely concealed what Eldredge had been doing and supply no ground for any argument that such a method of doing business by Eldredge on behalf of his employer was either authorized or encouraged. Upon the whole record it is difficult to escape the conclusion that Eldredge was acting with selfish and dishonest motives in the November joint venture as well as in the one involved in the case at bar.

As to the fifth cause of action in which Eldredge put up 1,461 cases of eggs belonging to Grossmann on January 20, 1933, as collateral with Merchants for loans previously made by Merchants to Droste-Snyder, Merchants admittedly was informed that Gross-

mann was interested in furnishing the collateral because it was engaged in a joint venture with Droste-Snyder. Eldredge had no actual authority to enter into a joint venture with another corporation. Such an enterprise was clearly beyond the scope of the administrative functions of Eldredge, who had no authority, actual, apparent or implied, to use Grossmann's merchandise for such a purpose. It is to be noted that this transaction followed in point of time the loans on the promissory notes. Obviously all of the facts taken together were more than sufficient to cause Merchants to investigate the authority of Eldredge to engage in these extraordinary deals for the National Dairy Products Corporation.

The claim that Grossmann ratified the joint venture with Droste-Snyder because the merchandise involved in the third, fourth and fifth causes of action was part of the entire consignment purchased from Bennett & Co. is not tenable. There is no dispute that Eldredge had full authority to purchase eggs on behalf of Grossmann. The eggs involved in the third, fourth and fifth causes of action were purchased by Eldredge from Bennett & Co. of Chicago, who were ignorant of any joint venture. This merchandise was paid for in full by Grossmann. There is no reason why Grossmann should be prevented from claiming title to these eggs without thereby affirming the unauthorized joint venture with Droste-Snyder and the unwarranted and the unauthorized loans to Droste-Snyder by Merchants on Grossmann's wares solely at the behest of Eldredge.

The counterclaims by Merchants were properly dismissed after the court had found that Eldredge was without actual or apparent authority to pledge the merchandise involved in the third, fourth and fifth causes of action to obtain loans, the proceeds of which were to be delivered to Droste-Snyder. These counterclaims represented balances remaining unpaid on the promissory notes executed by Eldredge allegedly on behalf of· Grossmann and also for a balance claimed to be due from the deficit arising upon the sale of the collateral held for the loan which is the basis for the fifth cause of action.

The judgment should, accordingly, be modified by eliminating therefrom the sum of $9,207, with interest from December 30, 1932 (first cause of action), and the sum of $5,733, with interest from December 31, 1932 (second cause of action), and, as so modified, affirmed, with costs to the appellant Merchants Refrigerating Company.

MARTIN, P. J., and CALLAHAN, J., concur; UNTERMYER and DORE, JJ., dissent and vote to reverse.

Dore, J. (dissenting). As to the transactions in the first and second causes of action, I agree that the appellant Merchants was protected in its dealings with Eldredge, the vice-president and general manager of Grossmann in New York, by reason of his apparent authority, and as to these two causes of action, judgment should have been directed in favor of Merchants.

The third and fourth causes of action relate to pledging with Merchants 2,375 cases of eggs purchased on a joint venture and borrowing thereon $14,250 upon collateral notes of Grossmann issued solely by Eldredge. In my opinion, judgment should have been in Merchants' favor on these causes of action also, as well as on the fifth cause of action.

Eldredge conducted Grossmann's affairs from its place of business in New York. Harding, the president of Grossmann, testified that Eldredge " ran this business in New York, yes," that he was in charge of the plant and did all the buying and all the selling. He was in sole and direct charge from the time of his election in April, 1932, to the time of his withdrawal or discharge in the latter part of January, 1933.

It is disputed whether Eldredge resigned as vice-president on January 6, 1933, or after January 23, 1933, but that is immaterial, as Harding testified that between January sixth and January twenty-third the business of Grossmann was conducted exactly the same as it had been prior to January sixth and that there was no change at all. Concededly, no notice was sent to Merchants that Eldredge had resigned. Notice was not sent either to the Irving Trust Company with which Grossmann banked, or to any one that did business with the corporation. Harding testified, " we didn't want to disturb things. I wanted to have Mr. Eldredge's business — that is, his connection with our company, a continuous thing, and there didn't seem to be any reason for it whatsoever." Two hundred checks of Alex Grossmann & Co., Inc., signed by Eldredge and Henry Reich, as treasurer, were in fact issued between January 6 and January 23, 1933, and were honored by Grossmann. These checks totaled $79,950.49. In fact, from the news item in *The American Creamery and Poultry Produce Review* of January eleventh, on which Grossmann relies, it is a fair inference that the change was to be effective from February 1, 1933. Eldredge testified that he received a telegram that his discharge took effect February first, and he received his check up to February first. In that state of facts, third persons, outsiders, dealing in good faith with Grossmann should not be charged with notice of an internal change in Grossmann's affairs, of which they had no notice, actual or otherwise, so long as Grossmann continued to hold Eldredge out

to the commercial community as acting in the same capacity as he acted prior to the change.

There were prior transactions that Merchants had with Eldredge acting on behalf of Grossmann in 1932 not involved in this litigation, except as indicating a course of dealing. In one previous transaction there was a prior collateral note similarly signed by Eldredge alone which had been honored by Grossmann. In July, 1932, Eldredge, acting for Grossmann, bought 4,238 cases of eggs then on storage in Merchants' warehouse, and Eldredge borrowed from Merchants $12,633.75 on a promissory note dated July 25, 1932, pledging the warehouse receipt for the 4,238 cases of eggs as security, and signed the note: " Alex Grossmann & Co., Inc., D. C. Eldredge, Jr., V. Pres." Grossmann paid that loan by twelve of forty-four checks constituting one of plaintiff's exhibits. These checks were signed by Eldredge and Grossmann's treasurer and paid to Merchants in recognition of Grossmann's obligation created by Eldredge's sole signature on the promissory note.

On December 5, 1932, there was another transaction involving a consignment of 1,318 tubs of butter sent to Merchants from one Faulkner for the account of Droste-Snyder subject to the payment of drafts for $19,968.98, concerning which Eldredge notified Merchants that Grossmann would pay the difference between what was loaned by Merchants and the amount of the drafts and confirmed the notice by letter dated December 5, 1932, sending to Merchants Grossmann's check for $6,788.98 signed by two officers of Grossmann, which, with the $13,180 advanced by Merchants, made up the amount of the Faulkner drafts which Merchants paid under the arrangement. That butter was stored for Droste-Snyder in accordance with Eldredge's written request acting on Grossmann's behalf in the letter of December fifth.

In November, 1932, Eldredge acting for Grossmann and Droste acting for Droste-Snyder had bought on account twenty-five cars of storage eggs on the Chicago Mercantile Exchange for November delivery, of which transaction Grossmann received and concededly retained a profit of $977.47. This transaction also was in Droste-Snyder's name but under an arrangement that Grossmann and Droste-Snyder would contribute equally and split the profit or loss equally. This was done and the profit of $977.47 remitted to Grossmann.

It is, therefore, not accurate to say that there were no former transactions similar in nature to those involved in this litigation and that Merchants was especially put on inquiry in the transactions here in question, as to Eldredge's authority to act as he did. The transaction involving the prior promissory note indicated a course

of dealing which informed Merchants that two-signature checks of Grossmann's were issued by Grossmann, with Grossmann's authority, to pay its one-signature note signed by Eldredge. As indicated, there were twelve such checks issued on twelve separate dates for varying amounts between July 26, 1932, and August 11, 1932. This might well excuse inquiry by Merchants on the subsequent transactions involving the promissory notes in causes of action three and four, especially since all of Merchants' dealing with Eldredge necessarily confirmed its faith in his authority to bind his principal in butter and egg transactions. Grossmann's office was in New York, and Eldredge was in complete charge of it. The president was in Omaha, Neb., and came to New York only five or six times a year for a few days, and Eldredge transacted, as the general administrative officer, the large Grossmann business in butter and eggs. Grossmann's annual volume of business was six or seven million pounds of butter and one and a half million dozens of eggs, which in 1932 would be upwards of two million dollars in gross business.

In addition to this, it seems to me that Grossmann ratified the transactions after full knowledge thereof. The eggs involved in the third, fourth and fifth causes of action are all part of twenty-eight cars of eggs which came into possession of Grossmann by delivery of the ninety-three cars that were bought on the joint venture by Droste through James E. Bennett & Co.

Grossmann's action against Merchants is in conversion and is predicated, therefore, on the theory that Merchants converted property belonging to Grossmann. The only way that Grossmann could possibly get the ownership of this property was through the purchase of the ninety-three cars in December as part of the joint venture, twenty-eight cars of which were delivered to Grossmann in January. The advances made by Grossmann prior to December 31, 1932, were made upon the *entire* purchase of ninety-three cars, and no part of these payments can now be segregated or allocated to any particular carloads of eggs. Grossmann's drafts, totaling $106,834.15, are much more than the purchase price of the twenty-eight carloads shipped to Grossmann, and, accordingly, it could never have been the intention of the parties at the time that Grossmann was buying and paying only for twenty-eight segregated carloads. Neither Eldredge nor any one else in the Grossmann company had any direct dealings with Bennett. All of the purchases were made by Droste, acting for the joint venture.

Grossmann concedes that it ratified the purchase of the twenty-eight carloads of eggs. But the twenty-eight carloads were part

of the ninety-three purchased by the joint venture. The law is clear that a ratification of one portion of a joint venture is a ratification of the whole. The law is also clear that the respondent may not claim title to the twenty-eight carloads of eggs without ratifying the means by which that title was acquired. Hence, a ratification of the purchase of the twenty-eight carloads is a ratification of the operation of the joint venture through which the purchase was made.

Up to now, in two causes of action tried together in a single trial, Grossmann has won in its cause of action against Merchants on the theory of conversion, that is, that there was ownership in Grossmann of the property converted; and Grossmann has simultaneously defeated the cause of action by Industrial Cold Storage against Grossmann on the theory of a complete repudiation of the joint venture. This result cannot be sound.

Of course, if the defendant as a warehouseman had a lien, it was not bound to deliver the eggs without an offer to satisfy the warehouseman's lien. (General Business Law, §§ 95, 112.) It seems to me that Merchants in the regular course of its business had acquired warehouseman's liens on the property in its possession and it was not obliged to surrender in the absence of a tender to satisfy the lien. Incidentally, the court refused to find that demands had been made by the plaintiff without tender of liens but these refusals seem contrary to documentary evidence of multiple demands made by Merchants from January 25 to February 1, 1933. Under sections 95 and 116 of the General Business Law these demands were ineffectual to make Merchants a converter of the butter and eggs demanded because of the conceded failure of respondent to tender the amount of the liens.

It is significant that the Grossmann telegram repudiating the joint venture was not sent until January 25, 1933, the day after there were no quotations whatever on storage eggs. Is it not conceivable and most probable that if the market had taken an opposite turn and there had been a profit on the transaction, Grossmann would have received and retained the profit as it concededly did on the prior Board of Trade transaction? Mr. McInnerney, president of National Dairy Products Corporation, in answer to a question whether they would have taken the profits if the transaction went " right," replied, " A. I hope not. I don't know." It is also significant that on Grossmann's books subsequent to December, 1932, there were five different changes with regard to the item of $977.44, the profit Grossmann received and retained on the former joint venture, the last entry being made in September, 1933, in accordance with instructions from the auditing department

of National Dairy Products " so that it may properly reflect the legal interpretation of our relation with Droste."

Whatever may be the truth of the claim that Eldredge did not reveal to his superiors the exact nature and extent of his transactions with Droste-Snyder, that should not be the responsibility of third parties warehousemen honestly dealing in good faith with Grossmann's fully accredited agent. When apparent authority is conferred the principal and not third parties should suffer from an actual exercise of authority not exceeding the appearance of that which is granted. (*Armour* v. *Michigan Central R. R. Co.*, 65 N. Y. 111, 121.)

A principal may be bound by the act of his agent even in excess of actual authority where a third person believing and having a right to believe that the act was within the authority has acted in reliance thereon and would sustain damage if the act of the agent was not considered that of the principal. (*Walsh* v. *Hartford Fire Ins. Co.*, 73 N. Y. 5.) Grossmann should not be permitted to place its business in the hands of a general manager with the broadest powers and then escape the result of his exercise of discretion and judgment. Similarly Grossmann should not be permitted to proceed to judgment against Merchants on the theory that it has ratified the joint venture and resist judgment against it in the Industrial action on the theory that it has completely repudiated the joint venture.

In the case of Grossmann v. Merchants the judgment appealed from should be reversed, with costs, the complaint dismissed, and judgment directed for Merchants against plaintiff Grossmann on the defendant's counterclaim, with interest and costs representing the amount of the balance unpaid after crediting the sums realized from the sale of the collateral security. Merchants' counterclaims to the first and second causes of action were withdrawn. Its counterclaims to the other causes of action are as follows: In the third cause of action, for $2,807.66; in the fourth cause of action, $2,772.41, the balance unpaid on the notes after the collateral was liquidated; in the fifth cause of action, for $933.45, principal and accrued interest remaining unpaid for the loan to Droste-Snyder in connection with the joint venture.

The trial court refused to find the terms on which the loans were made on the eggs involved in the third and fourth causes of action but it did find demand for payment and refusal, and sale for a price that was reasonable. Similarly the court refused to find the facts on the Droste-Snyder loans up to January 14, 1933, and refused to find the disposition made of the proceeds of the loan on the 1,461 cases of eggs in the fifth cause of action and also refused to find

demand and notice of sale, default, sale, the result of the sale, or the balance due after crediting the proceeds. Accordingly I consider that instead of directing judgment for a definite amount on the counterclaims the matter should be remitted to the trial court to determine the amount unless the attorneys can agree upon the figures.

The Industrial Cold Storage and Warehouse Company is the plaintiff in the second suit for the sum of $11,495.08, on the theory that Eldredge was authorized by virtue of his implied authority to enter into the joint venture and, therefore, that Grossmann is liable on the loans concededly made by Industrial to Droste-Snyder in connection therewith and also on the theory that Grossmann ratified the joint venture. For the reasons indicated above the judgment in favor of Grossmann in this case should be reversed, with costs, and judgment entered in favor of Industrial Cold Storage and Warehouse Company for the amount advanced on behalf of the joint venture less the amount realized through the sales, with costs. In this case, similarly, if the attorneys cannot agree upon the figures, the matter should be remitted to the trial court to determine the exact balance due.

UNTERMYER, J., concurs.

Judgment modified by eliminating therefrom the sum of $9,207, with interest from December 30, 1932 (first cause of action), and the sum of $5,733, with interest from December 31, 1932 (second cause of action), and as so modified affirmed, with costs to the appellant. Settle order on notice, reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.